IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs December 3, 2002

## STATE OF TENNESSEE v. ROBERT CLARK

**Direct Appeal from the Criminal Court for Shelby County**
**No. 01-05153    John P. Colton, Jr., Judge**

_____

**No. W2002-00940-CCA-R3-CD  - Filed June 18, 2003**

_____

Following a jury trial, the defendant, Robert Clark, was convicted of second degree murder, a Class A felony, and sentenced to twenty-four years to be served at 100% as a violent offender. On appeal, he argues that the evidence was insufficient to support his conviction and that the trial court improperly instructed the jury regarding the definitions of the mental states pertaining to second degree murder. Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOE G. RILEY and THOMAS T. WOODALL, JJ., joined.

Robert Wilson Jones, Shelby County Public Defender; W. Mark Ward, Assistant Public Defender (on appeal); Barry Kuhn, Assistant Public Defender (at trial); and Peter A. Stewart, III, Cordova, Tennessee (at trial), for the appellant, Robert Clark.

Paul G. Summers, Attorney General and Reporter; Braden H. Boucek, Assistant Attorney General; William L. Gibbons, District Attorney General; and R. Scott McCullough, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTS

During the early morning hours of July 18, 2000, the defendant's fiancée, Kimberly Palmore, was found severely beaten at the Cleaborne Temple homeless shelter in Memphis where she and the defendant had been residing. The victim was transported by ambulance to the Regional Medical Center ("The Med") where she subsequently died on July 26, 2000, as a result of the injuries inflicted upon her.

At trial, the victim's brother, Darren Palmore, described the victim's condition when he saw her at the hospital on the afternoon of July 18, 2000:

> Her head was swollen like this. Each one of her lips was about that big. The white of her eyes were swollen so bad that her eye lids wouldn't close. She was just swollen all over. She had tubes running all out of her and one of her lungs had collapsed and they had tubes going into her chest.

Marion Washington, the general manager at the Taco Bell where the victim worked, testified that the defendant came to the restaurant daily and stayed all day while the victim was working. When Washington saw the victim at the hospital, she was "swollen all over, just swollen like a balloon" and could not speak.

Officer Carlos Love of the Memphis Police Department testified that he was dispatched to the Cleaborne Temple on July 18, 2000, regarding a disturbance call. He found the victim, who had bruises on her face and was bleeding from her mouth, lying on a mattress. The mattress was covered with blood, and a bloody pillow was lying next to the victim's head when he arrived. Officer Love secured the crime scene and called for an ambulance.

Bobby Lee Marshall, the chief administrator at Cleaborne Temple, testified the victim had been living at the Temple's homeless shelter for about a month and that the defendant had arrived at about the same time. During the early morning hours of July 18, 2000, Marshall, along with John Blazer and Keith Burrell, conducted a security check in the chapel where about a dozen homeless men and women were sleeping. When they entered the chapel, the defendant, who was nude, jumped up from between some church pews and began apologizing to Marshall, who then heard the victim groan but did not realize she was injured. Believing that the defendant and the victim were having "like an affair, or something," Marshall told the defendant to gather his belongings and leave the facility. As Marshall checked on the victim, the defendant disappeared "in a split second." Marshall found the victim gasping for breath, and he and two others picked up the mattress she was lying on and carried her to the ladies' lounge where it was cooler. Shortly thereafter, the police and an ambulance arrived. Marshall described the victim and defendant's relationship as "ransacked" and said they had had severe problems.

Sheila Saunders testified that she was staying at the Cleaborne Temple shelter on July 18, 2000, and had met the victim there. After being awakened by someone she identified as "Country," Saunders went to the ladies' lounge where she saw the victim lying on a mattress:

> Her shirt was pulled up over her head. Her bra was pulled up here. Her [breast] was showing. Her pants and shorts were at the bottom of her ankles. And blood coming out of the side of her mouth. I notice[d] she had a hole on the side of her head.

An ambulance arrived, and Saunders accompanied the victim to The Med.

The defendant, wearing a torn T-shirt, came to The Med and asked Saunders where the victim was. Saunders told the defendant that he was in trouble because he had "raped [the victim,] . . . beat her up and choked her," to which he replied:

> Hey, I didn't do all that, man, I didn't rape my own lady . . . . I was between the benches fucking and she called out Keith's name and I slapped her and she got loud at me and I slapped her again and she got louder and I put my hand around her and I choked her.

Saunders and the defendant then went outside to talk, and Saunders told the defendant that the police were looking for him. The defendant left, saying he would return, and Saunders went back inside to the emergency waiting area. When the defendant subsequently returned, he was wearing a different shirt and was crying and angry. The two again went outside to talk where the defendant pulled a gun from underneath his shirt and said, "Keith and John, man, was fucking my old lady, man, I'm going to kick Dr. Marshall's ass. . . . I got this too . . . for that little nigger fuckin' my gal." Frightened, Saunders asked the defendant to put the gun away, and the defendant put the gun back under his shirt. They returned to the waiting area inside the hospital where a doctor informed them they could go see the victim. As Saunders and the defendant were walking with the doctor to the area where the victim was, Saunders told the doctor that the defendant had a gun and was the one who had attacked the victim. The doctor immediately called for security, and the defendant took off running. Saunders saw the defendant again later that day when the police were questioning him.

Officer Richard Jewell, Jr., of the Memphis Police Department testified that he was dispatched to The Med on July 18, 2000, regarding a prisoner being held by hospital security. Upon his arrival, Jewell saw the defendant who had been handcuffed by Jewell's partner. The officers then transported the defendant to the domestic violence bureau. Asked if he remembered any statements the defendant had made, Jewell recalled that the defendant had said, three times, "You're not going to convict me of this, because she's not going to prosecute," although he could not remember the defendant's exact words. No one questioned the defendant about the statement. Officer Jewell then identified a property and evidence bag bearing a tag with the date of July 18, 2000, as well as his name and that of his partner. The bag contained articles of clothing, including a pair of men's blue jeans, a "cut-up white tee-shirt, dirty," a pair of gray boxer shorts, a black leather belt, and a pair of white Nike Air tennis shoes with cream stripes, taken from the defendant.

Beverly Wilson, the manager of inpatient operations at The Med, testified, from medical records, that the victim was admitted to the hospital on July 18, 2000, at 3:10 a.m., for the stated reason of "assaulted" and "numial mediastium pulmonary edema."

Dr. Cynthia Gardner, an assistant medical examiner for Shelby County, testified that she performed the autopsy on the victim on July 26, 2000. The victim's cause of death was "complications of blunt trauma. The complication was that she developed adult respiratory distress

syndrome and it was a complication of blunt trauma to both the head and the neck." Dr. Gardner also found a hemorrhage in the deep tissues of the victim's neck which was consistent with strangulation. The victim's injuries included: swelling of the brain; swelling in the soft tissues around the eyes, as well as the eyes themselves; swelling in the chest, neck, and lips; hemorrhaging in the soft tissue in the deep tissue of the scalp all the way down to the bone and even on the surface of the bone; bruising on the upper right cheek, the right corner of the mouth, and on the tongue; bruising of the right upper lip extending into the gum line of the left lower lip and a laceration in the lips; bleeding in the right anterior stapes muscle in the neck and in the soft tissues surrounding the thyroid gland; and adult respiratory distress syndrome which was caused by an inadequate supply of oxygen. All of the victim's autopsy findings "occurred as a result of the blunt trauma to the head and to the neck." Dr. Gardner opined that the deep hemorrhaging was caused by a substantial force to the head and could have been produced by a "very forceful blow with a closed fist." No alcohol or illegal drugs were found in the victim's blood at the time of the autopsy.

Sergeant James L. Fitzpatrick of the Memphis Police Department Homicide Bureau testified that he investigated the victim's death and interviewed the defendant on July 28, 2000, after advising him of his Miranda rights. The defendant signed a waiver of rights form after indicating that he understood his rights and then gave a statement which was reduced to writing and signed and initialed by the defendant. Sergeant Fitzpatrick was then permitted to read aloud the defendant's statement. The defendant said he had known the victim for almost two years, and they were to be married on August 29, 2000. The defendant admitted he and the victim had an altercation in the chapel on July 18, 2000, because "they were 'pimpin' her." The defendant described the altercation:

> I see Kim comin out the lady's area where the women's bathroom was at and I see Dr. Marshall. . . . So I asked her what was up, what did Dr. Marshall say to you and she said, "nuthin". So I went back into the chapel where we had our mats. So I started talkin to her again. She got angry cause I asked her what was Dr. Marshall askin [sic] her about. So I said, "why you getting loud, we can talk like two grown adults." So I went over where she was at and we started talkin again and she told me don't worry about it, she'll take care of it. So I said, "okay."
>
> So I started kissin her and foolin around and we had sex and while we was having sex, I say, you must have been with somebody so she got mad again while we was havin sex. She said, "if I tell you, you can't say nuthin but I know won't love me anymore." So I said, "Kim, we can talk about anything, just tell me what's goin on." So she started out by tellin me a date that Dr. Marshall and Keith and John had sent her on. She had to do sexual favors for a guy. She told me that other guys came and I asked her why she didn't tell me that before and she said Dr. Marshall didn't want her to and that he would kick both of us out. Then she said, "he knew everything about me."

So we laid down. I laid on my mat and she laid on hers. I said, "you've been with Dr. Marshall haven't you" then she got upset and started fightin. So I grabbed her, pushed her head into the pillow and told her, don't get loud. The[n] I let her up and told her to tell me the truth, what's up. She was still mad and fightin so I grabbed the belt which was on my short pants that was underneath the bench beside her mat. I wrapped the belt around her neck once and choked her and told her don't get loud, we can talk. So I let her up and she told me about Dr. Marshall, Keith and John. Then she got loud again. I choked her again with the belt that was around her neck. I let go of the belt, loosen it off her neck then I heard her cough. I put my hands over her mouth and wiped her mouth off.

I called her name, Kim, she said, "what", I said, "talk to me" and she said, "what'cha want to know" and then she changed her mind. I hit her two times on the right side of her jaw, I said, "talk to me Kim", she didn't say nuthin, so I tightened the belt up and hit her two more times on the right side of her jaw. I loosened the belt, I heard her gag, I said, "Kim, open your mouth" so I tried to open her mouth. I put my head on her chest, her heart was still beatin but she wasn't breathin good so I blew into her mouth and called her name, "Kim" she was moanin. She grabbed my arm and I put my head down toward her mouth, couldn't understand what she was sayin so I said, "open your mouth, talk" then I heard a noise, someone was comin through the door, it was Dr. Marshall, then I took the belt from around Kim's neck. He saw me and told me to come here and I was still naked and her underpants and pants were off one leg. So I getup, naked, go to Dr. Marshall. He said, "you son of a bitch, I should kill you, why did you do this in this chapel?" Then he said, "get your stuff and get out." I said, "not without her" and he said, "get out" so I went to get my gray short pants and I got the belt but I couldn't find my yellow shirt that I was wearin. Then John escorted me upstairs and Dr. Marshall went into the women's lounge.

Sergeant Fitzpatrick said that the defendant had been incarcerated since his arrest on July 18, 2000, and that the defendant first learned of the victim's death on July 28, 2000, the day he gave his statement.

The defendant, testifying as the sole defense witness, said that he and the victim had lived together for about a year and a half before coming to Memphis from Blytheville, Arkansas, in February 2000 and were engaged to be married on August 29, 2000. They came to Memphis to seek medical treatment for the victim's son who was sick with sickle cell anemia and because the defendant was having problems in Blytheville with his children's mothers and had gotten "caught

-5-

with other charges over there about a situation that was going on." When they arrived in Memphis, they initially lived with two of the defendant's cousins before going to live at the Cleaborne Temple shelter. The victim went to the shelter around June 15, 2000, and the defendant went on July 1, 2000.

As to what occurred on July 18, 2000, the defendant testified that he went to where the victim was sleeping in the chapel to "comfort her."[1] The victim told him that Bobby Marshall and John Brasley had raped her. Hearing this, the defendant became upset and asked the victim for details. When the victim hesitated to respond, the defendant "hit her, two or three, maybe four times. But, only on the right side of her jaw." He next took his belt and "wrapped it around her neck, just a couple of seconds." The victim then began telling him what had been happening to her at the shelter. After hearing a noise, the defendant, who was nude, told the victim to remain where she was and then got up to walk around. He encountered Dr. Marshall and had a brief conversation with him. The defendant returned to where the victim was, got his "short pants," and told the victim he would be right back. He then went upstairs, packed his bags, and left the shelter. He went "[d]own the street to an open field," put his bag behind a bush, and waited for about an hour before returning to the shelter and waiting for the victim for about thirty minutes.

The defendant said he then went to The Med because "I assumed that it was her, because me and her had an altercation. Me and her, we did have a fight." He admitted he "hit [the victim] kind of hard on the jaw." He also admitted seeing Sheila Saunders at The Med but denied raping the victim, having a gun, or changing his shirt. The defendant said he was arrested that night outside The Med and was taken to the domestic violence unit. At that time, the defendant thought that the victim "had just got beat up, you know, hit. That was it." He admitted telling the police that the victim would not prosecute him because she loved him.

## ANALYSIS

### I. Jury Instructions

The defendant argues that the trial court erred in "instructing the jury regarding the definitions of the mental states pertaining to second degree murder" and that the "erroneous instructions effectively lowered the State's burden of proof and denied the Appellant his constitutional right to a unanimous jury verdict."

To prove second degree murder, the State was required to show that the defendant "knowingly" killed the victim. As to "knowingly," the trial court instructed the jury by reading Tennessee Code Annotated section 39-11-106(a)(20):

---

[1] On appeal, the defendant's counsel suggests that the defendant's trial testimony "lacks clarity," and we agree. The defendant's testimony is difficult to follow and, at times, seemingly contradictory.

"Knowingly" means that a person acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.

The defendant argues that the trial court's instruction lessened the State's burden of proof for second degree murder because it contained all three definitions of knowingly rather than just the applicable definition for the result-of-conduct offense of second degree murder; namely, the defendant was aware that his conduct was reasonably certain to cause the death of the victim.

To assess this claim, we will review the opinion of this court in State v. Page, 81 S.W.3d 781 (Tenn. Crim. App. 2002), in which the defendant made similar claims as to the trial court's instruction as to "knowingly." The juvenile defendant in Page was tried as an adult and convicted of second degree murder for causing the death of the victim by striking him in the back of the head with a baseball bat. Id. at 782. At trial, the defendant admitted he had swung the bat at the victim, but claimed he did it only to intimidate the victim, had not intended to hit him in the head, and could not believe that he had died. Id. at 785. Defense counsel conceded that the defendant had hit the victim in the head, but argued that the defendant had been intoxicated, was unable to appreciate his conduct, and had "'no understanding of how wrong it was . . . how severe it was at that time.'" Id. In Page, the trial court instructed the jury as to "knowingly" presenting three options: "(1) that his conduct is of a particular nature; or (2) that a particular circumstance exists; or (3) that the conduct was reasonably certain to cause the result." Id. at 786 (emphasis in original). On appeal, the defendant argued, as in the present appeal, that the trial court lessened the State's burden of proof by instructing the jury that the knowing element of second degree murder could be established not only by the defendant's awareness that his conduct was reasonably certain to cause the result, but also by the defendant's awareness that his conduct was of a particular nature or that a particular circumstance existed. Id. at 786. We agreed and remanded the case for a new trial for the jury to be instructed that the knowing *mens rea* of second degree murder requires that the defendant have acted with an awareness that his actions were reasonably certain to cause the death of the alleged victim. Id. at 790.

In the present appeal, the issue of the jury instructions as to "knowingly" was not raised either during the trial or in the motion for new trial. Accordingly, we may consider this claim, raised for the first time on appeal, only if it constitutes "plain error." Our supreme court adopted, in State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000), the five factors for identifying "plain error" which earlier had been enunciated in State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994):

The Court of Criminal Appeals has developed five factors to consider when deciding whether an error constitutes "plain error" in the absence of an objection at trial: "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal

rule of law must have been breached;  (c) a substantial right of the accused must have been adversely affected;  (d) the accused did not waive the issue for tactical reasons;  and (e) consideration of the error is 'necessary to do substantial justice.'"

The court in Smith explained that "the presence of all five factors must be established by the record before this Court will recognize the existence of plain error."  24 S.W.3d at 283.  In our review of this matter, we will consider two cases which are procedurally similar to the present appeal.

In State v. Keith T. Dupree, No. W1999-01019-CCA-R3-CD, 2001 WL 91794, at *3 (Tenn. Crim. App. Jan. 30, 2001), the trial court had instructed as to "knowingly" utilizing the pattern jury instruction then in effect, which provided that it was established if the person was aware "either: (1) that his conduct is of a particular nature; or (2) that a particular circumstance exists."  The instructions omitted the part of the "knowingly" definition providing that "[a] person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result."  See Tenn. Code Ann. § 39-11-106(a)(20).  The court in Dupree explained why the instructional error was not harmless:

> We are unable to find harmless error.  The sole issue in this case was whether the killing was knowing or accidental.  In other words, the sole issue was whether the defendant was aware that his conduct was reasonably certain to cause the result.  Yet, this element was not conveyed to the jury, and a lesser standard was set forth.

2001 WL 91794, at *4.

A further consideration in the court's determination in Dupree that the error in instruction was not harmless was the fact that the jury had asked the trial court the question, "According to the law, does pointing a gun at someone else assume that the person pointing the gun 'knows' that the gun will hurt the other person?"  Id. at *5.

In State v. Tony Martin, No. W2001-02221-CCA-R3-CD, 2003 WL 261937, at *8 (Tenn. Crim. App. Feb. 7, 2003), the trial court gave instructions identical to those in the present appeal, and no objection was made either during the trial or in the motion for new trial.  The majority determined that the instructional error was harmless, while Judge Joseph M. Tipton, in his concurring opinion, opined that the court could not consider the issue because it did not constitute plain error, for the State had not, in its final argument, utilized the erroneous definitions of "knowingly" and the theories of the parties did not do so either.  Id. at *10.

Likewise, we cannot conclude that the instruction of "knowingly" utilized by the trial court in the present appeal constitutes "plain error."  Since the record on appeal does not include either the opening statements or closing arguments, we cannot determine to what extent, if any, the parties

-8-

utilized the superfluous language in the "knowingly" definition. Further, the jury's question as to this definition was not preserved, and we cannot speculate as to what it may have been. However, we note that the trial court instructed the jury as to the lesser offenses of voluntary manslaughter, reckless homicide, and criminally negligent homicide, and the defendant fully explained his version of what had happened. By its verdict, the jury rejected his explanation. Because of that fact, as well as the correct definition of "knowingly" having been within the instruction given to the jury, unlike in <u>Dupree</u>, we respectfully disagree that we may consider this issue as "plain error." Accordingly, we conclude that this issue is waived because it was not raised at trial or in the motion for new trial.

## II. Sufficiency of the Evidence

The defendant argues that the evidence was insufficient to support his conviction for second degree murder because there was no proof that he "was aware that his conduct was reasonably certain to cause the death of the alleged victim." He asserts that at most the proof showed that he "should have been aware of high risk that a death might occur."

In considering this issue, we apply the familiar rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 (1979); <u>see also</u> <u>State v. Evans</u>, 838 S.W.2d 185, 190-92 (Tenn. 1992); <u>State v. Anderson</u>, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992); Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. <u>See</u> <u>State v. Pappas</u>, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." <u>State v. Grace</u>, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

<u>Bolin v. State</u>, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing <u>Carroll v. State</u>, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted

defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The defendant was convicted of second degree murder which is defined as "[a] knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1) (1997). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Id. § 39-11-302(b).

In his statement to Sergeant Fitzpatrick, the defendant testified that he had choked the victim with his belt, loosened it, heard her cough, and hit her twice in the jaw when she did not talk to him. He again tightened the belt around her neck and hit her twice more in the jaw. When he loosened the belt, she "wasn't breathin[g] good." From this testimony, in addition to that of Bobby Lee Marshall, who interrupted the beating, and Dr. Gardner, who said that the victim died as a result of complications of blunt trauma, a reasonable jury could conclude that the defendant's severe beating of the victim resulted in her death, which was the foreseeable result of his beating and choking of the victim.

## CONCLUSION

Based upon the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE

-10-